Good afternoon, Your Honor. May it please the court. My name is Spencer Nathan Thal, and I'm representing District 751 of the Machinist Union, along with my co-counsel, Carson Phillips-Spots. During our rebuttal time, he will be addressing the issues raised by the Employers Cross-Appeal, so we'll try and reserve four minutes for rebuttal. The Board erred by applying its default Master Slack standards, which apply in cases involving the broad range of unfair labor practices that an employer might commit, instead of the standard prescribed by Hearst and SFO Goodnight that applies when an employer's unfair labor practice encourages and therefore propels the decertification effort upon which the employer then relies to withdraw recognition from the union. Now, under SFO Goodnight, when that occurs, the petition is per se tainted. The principle here is that an employer can't rely on the fruits of its own misconduct in any degree. This is a policy that's designed to exclude employers from being active in the process of employee self-determination. Now, the employer in this case promoted Lorianne Downs Haynes and increased her wages during the very same time frame that she was circulating a decertification petition, which the company then relied upon to withdraw recognition from the union. And as the dissenting board member correctly pointed out, this really is the very essence of a case that's properly analyzed under Hearst and SFO Goodnight, not Master Slack, because the employer encouraged Ms. Downs Haynes' decertification efforts by promoting her. Hearst and SFO Goodnight both stand for the proposition that in such circumstances, the petition is tainted, rendering the subsequent withdrawal of recognition by the employer. Let's assume that you're correct about Master Slack. In this case, did you waive that argument by not raising it with the ALJ? No, Your Honor. The jurisdictional issue, and I think it is worth addressing that, we have three responses on it. And this issue is properly before the court for decision, just as it was properly before the board for decision. There are three reasons for that. The general counsel raised it specifically in its brief, citing Hearst and SFO Goodnight. We have a motion pending before you to add that to the record. But in any event, and most critically, the union also raised the issue, albeit not specifically citing Hearst and SFO Goodnight to the board. And most critically, when you look at the board's brief in this appeal at SER 1630, you're going to find that the, I'm sorry, at page 50, you're going to find that the rule that requires raising these issues with the board at the earlier levels is there because the court should have the benefit of the board's analysis when reviewing the administrative determination. But here the court has that. The board, both the majority and the dissent, did consider the relevant legal authority of Master Slack as compared with Hearst and SFO Goodnight, analyzed it, came to different conclusions. But there's no question that the court has the benefit of the board's analysis in this case. And that's because both the board and the general counsel did raise the issue below. Now in this case, AIM didn't, they didn't instigate or circulate the petition. They didn't encourage, there's no evidence to encourage any employees to sign it. How does conduct like that come within the Hearst presumption? That is an excellent question. And I think it's really answered in SFO Goodnight. Because in Hearst, there is some sense that it has to be active participation, just as you've described in either the handling of the petition or something of that nature. But when you look at SFO Goodnight, the decision there makes it absolutely clear at both the board and the court level that the issue about instigating or promoting the decertification effort is much broader than that and includes words like encourages. And that's because the fundamental jurisprudence here is that the withdrawal of recognition is an exception to the general rule that employees are democratically entitled to make a free choice through an election process. And the board, as a matter of policy, made the decision that they wanted employers to stay out of the decertification petition gathering process if they wanted to withdraw recognition. And so when you go look at those, that SFO Goodnight case, you'll see that the standard is actually much broader. Actually, what was wrong with what the ALJ decided? She looked and said that the decertification petition was being certified by Hanes after she'd been rejected for the promotion the It doesn't appear that the offer of the promotion to her had an impact on other people who signed that petition. So what's what's the causal link? It's another excellent question. And that question really goes to the very issue at this appeal, Your Honor, because that issue, the causal link would be relevant if we were applying the master slack standards. But what's absolutely clear is that when you're in the universe of Hearst SFO Goodnight, that is not a necessary fact to consider. And that's not a particularly satisfying answer because you're telling us, ignore the facts. We've got this doctrine that leads to a result we want. And why should we ignore the facts? No, it's not to ignore the facts. It's to say that what is not required is showing some causal link between the employer's that that had some impact on the employees during their process. Well, if the petition has a signature from a majority of the employees, why should we dishonor that? Why shouldn't the employees allowed to be allowed to accomplish the result they presumably wanted to accomplish? Because of the taint, because all of the NLRB law. But what was the taint? What was the taint? If if if Hanes isn't motivated by this, and if the other employees aren't motivated by this, what's the taint? Because the because the NLRB has a policy that says we do not want employers interfering with the process of the signature gathering. And if they get themselves involved in encouraging that, that taints the petition. I really haven't given you opportunities to explain to me why we should ignore the employees signatures. And I haven't heard a factual explanation. It sounds to me like you want us to ignore the employees signatures, not because it actually had a factual impact, but because you want us to apply this doctrine. This is your third opportunity. Is there a reason for us to ignore the employees signatures other than your effort to apply a doctrine? I hear that argument, but factually, I don't see anything that explains why the employees signatures shouldn't be taken for what they were. Again, in order to avail itself of the ability to withdraw recognition in the absence of the democratically conducted election, the employer has to have objective evidence of a petition that was obtained free from coercion and taint. If there is coercion and taint, that invalidates the petition and invalidates the withdrawal of recognition. You haven't identified the taint. I've given you three opportunities to identify the taint factually here. And so far, I've heard nothing. The taint is the during the during the gathering of the petition signatures, the employer promotes a leader of that effort. The employer promotes the leader of that effort, encouraging that effort. That is the encouragement. That is the taint. I'd like to reserve the remainder of my time if I can. Yes, you may. Thank you. All right. I believe that next is Mr. Roberts. Is that right? Yes. Good afternoon, Your Honor. Charles Roberts, Aerospace. We've intervened on behalf of the board in support of their finding on the withdrawal of recognition. And then we have a separate cross appeal on the promotion issue. Let me briefly, I'm sure the board will address the questions in more detail, but I don't believe that the correct statement. There isn't any taint on the petition. The master slack analysis, which the judge applied and which the board applied, they looked at all the factors and found that employees would not even know whether they were more qualified or arguably more qualified. The only two candidates for the job that were internal were both anti-union and Republicans. We're going to talk about in a moment the discrimination issue, but with respect to the Hearst argument, I think they clearly waived that. That is a jurisdictional issue and the party relying on it has to make that argument. The union never argued that Hearst applied and the board never argued that it applied. They cited it simply as a statement of the law. The unions, the unions, if in fact the board had found that there was any actual assistance in the petition, if the employer had actually, if supervisors had helped solicit signatures or things of that nature, then in those circumstances, Hearst would apply. But they don't apply when you have what is essentially an unconnected. I'll defer to the board further on that issue, but I think the board was entirely correct with respect to the with respect to the the promotion issue. Our basic argument is that the board never found an actual discrimination, at least not as that term is legally met in the terms of the National Labor Relations Act. As I indicated, there are only two employees who applied for the position when the job was first came vacant. It was a receiving clerk position. I believe it's on. Is that is that necessary to find discrimination against the union employee? I think it's necessary to find some type of discrimination. The Great Dane Supreme Court decision makes it clear that a discrimination is an essential element of an 883. But this case was litigated under an 883, which is Section 883 of the National Labor Relations Act, 29 U.S.C. 158. And that requires an actual discrimination which causes disaffection or disaffection with the union. What we're saying is, is that the board never explicitly found it. And to the extent that they found, they never found who we should have hired if we supposedly should have hired somebody externally. I would point out that. Well, why does it have to find you should have hired somebody when the company decided not to consider any of the external candidates the second time around? I mean, that kind of screams out. Why did they do it differently the second time if it wasn't meant to say, hey, we got some people that we want to encourage. So let's decide not to take any external applications the second time. Well, let me answer it this way, Your Honor. They did take they did take external applications. They hired an external candidate who quit after two weeks and their policy doesn't favor or unfavor employees. They look at both categories. Having looked at the first category, the non-employees, I don't think it's unreasonable or doesn't the timing look a little suspicious to start out with? Only in the sense that the guy, the external candidate, quit on June 26. Your Honor, the job was reposted on June 29. And the very next day, they interviewed the other internal candidate who was not actually involved in circulating. Yeah, but lo and behold, the day before they find out that the candidate they select has a recertification petition. Yes, I understand that. But the timing, you have to admit the timing works against you a little bit, doesn't it? Works against us a little bit. But I would argue, Your Honor, that there is an intervening circumstance in the individual quit on the 26th. They reposted it on the 29th. They decided to limit the pool to people they had previously decided weren't worth even interviewing. And it's not like we're talking about. I mean, there's no discussion as to why the person stopped showing up at work. We're not talking about some really high powered, hard to find person. We're talking about a receiving clerk. And so it's hard for me to infer because the first person quit the company as a basis to decide, well, no external candidate could possibly be the person we want to hire. Now, we want to limit ourselves to a pool that contains only people that we decided before weren't worthy of an interview. And that's a hard sell. And they also found that Ruffcorn's explanation wasn't the most credible as to why they didn't bring in external candidates. What I would say, Your Honor, I understand your points. Obviously, the timing of it is unfortunate, only in the sense that when things like this happen, sometimes they happen coincidentally because of other circumstances that may be occurring. I would say that there seems to be on the point of the other, I guess the point I would make would be is that the board seems to have something of a built in bias against employees who oppose the union. If this had been the opposite situation and if Ms. Downs-Haines had been a supporter of the union and they had in the midst of this thing refused to interview her or consider her, I suspect that we would have been on the opposite end of this of this argument. The allegation would have been that we discriminated. So, I mean, I want to make it clear, Ms. Downs-Haines had an absolute legal right, a Section 7 right, to oppose the union and to engage in her activities. There was nothing inherently improper about that and no reason she should be penalized any more than she should be rewarded. How would she be penalized? I mean, indeed, what are the consequences of this finding? I understand it's limited to the company, but I'm not even sure there are consequences for the company, but I see none for her. Well, that she didn't get the promotion that she that she sought. She didn't get if she had been denied the promotion, she would have actually lost. Facts of this case, she got the promotion, right? I'm saying that if it had occurred the other way, if, in fact, they had refused to do it, that would have been a pretty elaborate way to avoid talking about the facts of the cases we have them. And you're trying to tell us the board is biased in a context where, in fact, the board on what seems to be the bigger issue ruled in your favor. I don't really understand the point of the argument. You can connect it up. I'll listen, but I don't see the point. OK, well, I'm not sure I can do better than I have, Your Honor, so I'll move on from that point. I don't I think my point was that there's no actual discrimination, which is a legal element of the of the claim. Now that I've raised it, let me ask you, what are the consequences? Are there consequences for your client as a result of this decision? Post the notice, there's no there's no real consequences. I mean, not much, right? No. And our appeal was only filed after the union. I appreciate that, but I'm not sure there's much more for us to look at if I presume you posted the notice. So zero consequences after that, unless for some reason we revisit the other part of the NLRB decision. Well, that that is that since the union's argument is based on the promotion of Ms. Dowd-Taines, then, of course, that's an issue that we felt compelled to raise before the court. I see my time. I've got like a minute left. I'm going to reserve that in the event that there's anything that comes up from the board that requires response, if that's OK. Very well. I believe that we're going to hear from the board next. Mr. Phillips, you're coming on later on, right after the board. Very well. So let's hear then from Mr. Fitzmaurice, please. Thank you. May it please the court. My name is Brady Prince-Usco Fitzmaurice and I represent the National Labor Relations Board. I think I'll just dive into the promotion violation to begin with and move on to the withdrawal of recognition afterwards. So as your honors have noted, this is not a situation where the court has to speculate as to how the company would have acted in the absence of an employee's protected activity because we actually have facts and record evidence to show us. Ms. Townhains applied to a vacant receiving clerk position before engaging in any protected activity. The company denied her, did not even interview her. After she instigated the decert campaign and started circulating the decertification petition, his first choice for the job, abandoned the job and Ms. Townhains applied for the exact same job again. This time the company hired her. The only difference was her decertification activities. I'd like to note a couple of things. They say the one who hired her said, you know, we had bad luck with this external person we brought in. Didn't even know that Townhains was interested. And they don't deny the fact that Townhains has been in there for trying to get information about how to proceed with the certification. But, you know, what's the violation there? That's right, Your Honor. The company basically claims that they decided to exclude all external candidates on the basis of this experience they had with the initial hire. The board looked at that and, you know, made a few findings. One, it just kind of doesn't pass the sniff test that one bad apple would ruin the whole batch. And Your Honor may have pointed that out earlier. But what's wrong with saying we have somebody right here in our midst? We don't need to go through another process of interviewing external candidates. Townhains is here. She's done a nice job. She has some minimum experience. Why not give her the job? I mean, I don't see how that's you're calling that a violation, correct? Well, I think under some facts not present here, that would not be a violation and that would be perfectly lawful. However, here there are facts and evidence that show otherwise. Where is it? What makes it cross the line? Well, the board made a finding that the hiring process was pretext. One of the subsidiary findings there was that the company exaggerated her experience to justify choosing her over more qualified candidates. She filled in the shipping receiving department on a single occasion and the company exaggerated that to say that she had a year and a half experience in the job. That's just not supported by record evidence. Also, the company relies on the testimony, as noted, of Ms. Townhains. Her testimony simply was not credible. The board found that her testimony that she had not received Ms. Townhains' application during the initial round of hiring lacked credibility and also found her testimony that the company had only reposted the job internally and not externally didn't hold up in light of other evidence, including additional external applications that came in. So the evidence that the company relies on for its legitimate, supposedly legitimate hiring process simply doesn't hold water. As also has been noted, the company departed from its past procedure of giving equal consideration. This court has held that that's a hallmark of a pretext finding. Finally, the timing kind of provides the counterfactual of what would have happened absent the de-cert activities and what would have happened with the de-cert activities. The company argues that there's no discrimination here, and that's really just a game of semantics, I think. The board has cited some cases in its decision, the Miramar Hotel case, the Remington case, the Kansas City Power and Light case is also on point, where the question basically is, what was the motivating factor? What was the motivating factor driving the decision to take the employment action? There are other decisions where there is not necessarily an adverse action, but maybe something positive was done to an employee or something was done to all employees. And you can you can see the motivation by comparing how the employer had acted before the protected activity with how it acted after the protected activity. This is just another case in that line of discrimination. And there's really nothing controversial about that. One more note about the promotion violation, I just do want to make clear the consequences of the order, our notice posting and electronic distribution of the notice. That's all. Unless there are additional questions as to the promotion violation, I'll move on to the dismissal of the withdrawal of recognition. I guess I will ask the significance. Is there significance to the first? I mean, it seems to me that the second issue that you're about to address is the one that is really the one that casts a shadow on everything. Unless we decide to revisit or ask the board to revisit that issue, does the board's determination that the company had committed unfair labor practice have any practical impact any further? I don't think it does, your honor. You know, here you can move to the second issue because that's the one that does have does have some practical impact. So with regard to the withdrawal of recognition, the board dismissed this allegation essentially on the basis that all the evidence showed that the decertification petition was initiated, drafted and circulated exclusively by employees. As has been noted previously, where enough for labor practice may have tainted a decertification petition, the board is presented with this kind of sticky situation. It has to carefully give effect to employee free choice while considering whether the employer's misconduct tainted that choice. Here, a finding of taint would have set aside a decertification petition signed by a majority of 272 employees. The board considered whether down-taint promotion, the only unfair labor practice, tainted that petition and rejected that possibility, applying the Master Slack test. I won't bother delving into the Master Slack test. The union can test its applicability, but it takes no issue with the actual application of the test. Where the union's challenge comes into play really is its argument that Master Slack should have applied the conclusive presumption of taint under Hearst. In this argument, you know, as you know, the board asserts that this is jurisdictionally barred under section 10E. The union concedes that it never cited Hearst before the board. The first time the union can cite is in one of its exceptions. And that's an exception in which the union states that ALJ erred by requiring specific proof of a causal connection between the promotion of Ms. Down's taints and the loss of union support. That really doesn't get the union where it needs to go. Master Slack is the test that the board applies when causation is not apparent in the record evidence. It's a test used to decide whether an inference of causation is appropriate. Therefore, the union's exception would not call Master Slack's applicability into question. Just today, actually, the union filed a motion to supplement the record to add counsel for general counsel's brief in support of its exceptions. That motion should be denied. The brief that the union seeks to include is not part of the administrative record. The board has submitted a letter to the court on this point. Furthermore, as counsel for the company noted, the brief only cites Hearst as a statement of law relevant if there had been more misconduct, more closely directly related to the decertification petition and campaign. The counsel for the general counsel was presenting an entirely different argument than we were presenting here, an argument that had to do with other allegations of unfair labor practices that both the ALJ and the board dismissed and that the union does not challenge on appeal. So this is all extra record material that really doesn't need to be relied upon here. Finally, I would just note that the union's filed two briefs in this case. It didn't mention this material in either of its briefs, waited until the date of argument, which I think is frankly just too late. So plenty of reasons for the court not to consider this argument that the Hearst presumption applies. If the court even gets there, it's really not startered. Hearst applies a conclusive presumption. This is not a case where it raises a presumption that can be rebutted. This is a conclusive presumption, meaning sorry to the majority of those 270 plus employees who signed a petition. We're taking that expression of your choice away from you and we're finding that that petition is no good. There's a reason the board applies that very narrowly. On that point, I would note that the union makes a lot of hay about the SFO goodnight case. SFO is on point and it's helpful in distinguishing Hearst from Master Slack. The union argues in its brief that we, the board, have cited cases that post-date, I'm sorry, that predate SFO goodnight, which is true, but SFO goodnight actually cites those same cases and they remain to be good law. All right. Well, I think I've reached the end of my explanation of the decision in order. I don't hear any questions. Do either of my colleagues have any questions of the board? Hearing none, we will then go to rebuttal and who's going to go first? Mr. Carson Phillips, is that right? It's strong. And Carson Phillips Fox here for the union, may it please the court, just to touch briefly on the 883 discrimination issue. You know, the board got it right when it held that the employer violated 883 when it excluded and passed over 20 external candidates and instead hired Ms. Downs Haynes as a reward for anti-union activity. And I want to touch on a couple of points raised by the employer, mainly the legal argument that arises that desperate treatment is a prerequisite to an 883 finding. That's not correct as a matter of law. We cite numerous cases, as the board counsel has alluded to, that states that an employer violates the law when it treats all employees equally, but when it's motivated by anti-union animus. So that argument fails as a matter of law. And the factual predicate also just does not hold water. I think Judge Clifton hit it on the head. There is disparate treatment between Ms. Downs Haynes, the person that the company awarded, and the 20 other candidates, two of whom the board found were more qualified. And lastly, I just want to hit on the jurisdictional issue. Let me ask my colleague, you're over time and we realize you kind of got brought in at the very end. Do either of my colleagues have any questions for Mr. Phillips? I'll tell you what, you probably haven't had this opportunity too much. Why don't I give you another minute? You can give us the rest of your argument. I appreciate it. I just wanted to hit on the jurisdictional issue that my colleague wasn't able to in on. And the state of the law is that the issue has to be raised in some form or fashion before the board. It's not imperative that it be raised by the union. As my colleague had mentioned, the board had numerous opportunities to discuss it. And in fact, in footnote two, the board's decision to grapple with the distinction between Master Slack and SFO Goodnight and Hearst. So we therefore believe that the issue is probably before the board, or before the court. Very well. Thank you very much. I think, does anybody else have rebuttal time remaining? I don't know. I don't think so. So we thank all of you for your argument. Very helpful. It just argued is submitted and the court stands adjourned for the day.
judges: Fisher, Clifton, M. Smith